**KIMIKO ARITA, Plaintiff,**

v.

**William P. ROGERS, Attorney General of the United States, as Successor to the Alien Property Custodian, Defendant.**

**Civ. No. 1598.**

United States District Court
D. Hawaii.
Feb. 26, 1959.

Shiro Kashiwa, Honolulu, Hawaii, for plaintiff.

Louis B. Blissard, U. S. Atty., Honolulu, Hawaii, for defendant.

WIIG, District Judge.

This cause came on for trial, and the Court having heard the evidence and the stipulations of the parties finds the facts and states the conclusions of law as follows:

### Findings of Fact

1) That the Court has jurisdiction over this cause;

2) That plaintiff has fully complied with the provisions regarding timely filing of claims for return of property, having a value of about $5,000, under the provisions of the Trading with the Enemy Act, as amended, 50 U.S.C.Appendix, § 9; that this action was brought within the time provided by the Statute of Limitations and all conditions precedent to the filing of an action of this nature have been complied with;

3) That plaintiff was born in Japan on January 7, 1901, and immigrated to Hawaii at the age of 14 to join her father Rinsuke Kuniyuki, who was then residing in Hawaii with her other brothers and sisters; that at first she lived with one of her sisters at Ewa, Oahu and shortly after moved to Honolulu; that she married Takazo Arita on August 19, 1920 at Honolulu, and gave birth to two children, a girl named Chizuko, born February 25, 1921, and a boy named Yoshito, born May 30, 1923; that in March, 1927, plaintiff and her two children visited her husband's parents at Fukuoka, Japan, but because of economic difficulties the children were left with her husband's parents, and shortly thereafter she returned to Hawaii and she and her husband moved to Lanai City, Lanai, Territory of Hawaii, to operate a barber shop; that they both worked in the barber shop with another hired employee, which shop was purchased from the owner by the husband;

4) That in July, 1933, their son, Yoshito, returned to Hawaii and attended school while living with his uncle, Aisuke Kuniyuki; that he graduated from an elementary school in 1937, finished an intermediate school in 1940, and thereafter attended McKinley High School; that their daughter, Chizuko, returned to Hawaii, and in February, 1941 she was attending a sewing school in Honolulu; that in March, 1941, plaintiff and her husband sent both children to Japan because their grandfather was ill; that said grandfather died on November 3, 1941, and because of Buddhist custom, which required them to remain 49 days after death, they remained in Japan, and while so waiting, World War II started and the children were stranded in Japan; that Yoshito continued going to school until he was drafted into the Japanese military forces in 1944, where he served until his discharge on December 25, 1945; that Chizuko taught school in Japan until she was married in 1944 to a Japanese national; that Yoshito applied for a passport to return to Honolulu in August, 1951, but said application was denied because of his service in the Japanese Army;

5) Plaintiff's husband was born in Japan on February 28, 1886, the eldest son of Eihichi Arita; but, contrary to custom, which required the eldest son to look after his parents, Takazo Arita went to Hawaii as a young man and made his home there, leaving his younger brother, Sataro, to carry out those duties; that plaintiff and her husband visited Japan from March, 1934 to June, 1935, and at that time Eihichi Arita formally reported his retirement as family head, and Takazo Arita was appointed and registered as his successor in the family register; that upon his father's death in November, 1941, the younger son, Sataro, was given the farm and the family residence, and Takazo received only a small share of the estate consisting of a small plot of land, described as three "tan";

6) That the barber shop heretofore mentioned was situated in a frame building with the shop in the front and living quarters in the rear; that it was rented from the Hawaiian Pineapple Company, Ltd., and it is a matter of common knowledge that the Island of Lanai is owned by said company and one cannot purchase land there; that prior to the detention hereinafter more particularly mentioned, plaintiff and her husband appeared in all respects to be living in Lanai City like any other family similarly situated; that in early 1942, plaintiff's husband was taken into custody and interned as a Japanese alien, the reason why he was interned was not disclosed at the trial, and the husband denied any knowledge as to the reason why he was interned, and the evidence in this case did not disclose that he had a hearing relating to said internment; that after being taken into custody on the Island of Lanai, he was shipped across the channel to the Island of Maui, where he was confined in a military camp for a short time until he was shipped to a detention camp at Sand Island in Honolulu Harbor; that from Sand Island, he was sent to internment camps in the interior of the United States, and finally to such a camp at Santa Fe, New Mexico; that upon his request plaintiff joined him in 1943, and they were allowed to live in a camp at Crystal City, Texas;

7) That after plaintiff's husband was taken into custody in early 1942, she lived alone in her home in the back of the barber shop in Lanai City until she decided to leave for Honolulu, after selling the shop for a small sum and disposing of most of her furniture and household goods and the family automobile; that due to war conditions, there were no means of water transportation to ship the personal property to Honolulu; that plaintiff stayed at her brother's home in Honolulu, and worked as a barber while waiting for transportation to join her husband; that the departure of plaintiff and her husband from Lanai was under all circumstances clearly involuntary; that their departure from Hawaii to the mainland United States was also clearly involuntary; that they had permanently resided and maintained their domicile in Hawaii for more than 25 years prior to this involuntary departure; that there is nothing before the Court to indicate that they would have changed their residence had it not been for his involuntary internment, which was a consequence of World War II; that the consequences resulting to plaintiff and her husband from her husband's internment, even though necessary under the awful exigencies of war, made a terrific impact on them—an abrupt termination of their family and workaday life, loss of earning power to support themselves, a lengthy separation between husband and wife, a feeling of shame and guilt engendered by suspicion, a barren existence in barren camps, insecurity and dim hopes for the future; that the involuntary nature of their departure from Hawaii, their settled and permanent place of abode, infected whatever actions they took thereafter; that a necessary factor in the change of domicile, or even something less than domicile, is a free and dispassionate decision to abandon that which had meant security, offered opportunity and happiness, and having a home in the fullest sense that we in America like to understand that familiar word, and through no apparent fault of plaintiff and her husband, they were denied the privilege of making that decision in such a manner; that in order to effect a change of domicile, there must be a voluntary abandonment of a settled and permanent place of abode, coupled with the acquisition of a new domicile freely and voluntarily assumed; that at no point in a series of events in this case can it be said that plaintiff and her husband, or either of them, voluntarily and freely decided to abandon their domicile in Hawaii;

8) That after the hostilities of World War II ceased in August, 1945, plaintiff and her husband filed an application, requesting that they be sent to Japan; that it was their intention to go to Japan to see their children from whom they had

heard nothing during the war years; that at that time the United States was offering persons of Japanese nationality a choice between repatriation to Japan or remaining in the United States. This choice was offered plaintiff and her husband. Those choosing repatriation had no commitment from the U. S. Government to permit their return to this country at any given time—or ever; although plaintiff and her husband were not told they ever could return to the United States, they did hope they could return some day; they intended to stay in Japan until the Peace Treaty was signed but had no definite date in mind for return to the United States; that after their sailing from Seattle on December 8, 1945, the testimony does not reflect the acquisition by plaintiff and her husband of a settled, established and permanent place of abode in Japan having domiciliary properties; that during their stay in Japan, from December 8, 1945 to May 14, 1954 when they returned to Hawaii, they lived in several places without establishing any sort of residence or domicile; that upon arrival in Japan, they lived with the husband's younger brother, Sataro, in his home for about 40 days, leaving because of family difficulties; thereafter, plaintiff and her husband and son Yoshito moved into a small room on the second floor of a house owned by one Koga, where they stayed for about a year and ten months, when they were told to vacate the room, and thereafter they moved to Tokyo to live with their married daughter, her husband, and their children, and finally they lived on some property in Tokyo where plaintiff managed an apartment house for her brother Aisuke Kuniyuki, for which she was allowed to retain a portion of the income for her own use; that while living with Sataro's family, plaintiff and her husband helped around the house, and after moving into the Koga house, plaintiff's husband tried to farm the three "tan" of land left him by his father, which efforts were unproductive; that they lived with their daughter for about two years, during which time they were supported by their son-in-law;

9) That on or about September 28, 1945, a parcel of land with buildings thereon was purchased in the name of plaintiff and her husband in the Shinagawa section of the City of Tokyo, and in November, 1952 said property was improved by the addition of certain apartment buildings thereon; that the entire purchase price and the improvement costs were furnished by Aisuke Kuniyuki, plaintiff's elder brother, who is a wealthy apartment house owner in the City of Honolulu; that the beneficial owner of said property was Aisuke Kuniyuki, and that the property was purchased in the name of plaintiff and her husband in 1945 because Aisuke Kuniyuki was not a resident of Japan and Japanese law at that time required owners of land in Japan to be present in Japan;

10) That in late 1948, or early 1949, plaintiff started to get information about returning to Hawaii by contacting the American Consul in Japan, and she was permitted to file her application to return in 1952; that plaintiff visited the American Consul in Tokyo many times before she was successful in receiving necessary papers, authorizing her and her husband to return to Hawaii; that in early May, 1954, the American Vice Consul at Tokyo determined that plaintiff was a returning resident alien, and on May 21, 1954 she was admitted to the United States at Honolulu as a returning resident alien by the Immigration and Naturalization Service of the Department of Justice;

11) That during plaintiff's stay in Japan, she did not vote in any elections, nor did she participate in any community and neighborhood affairs; that she was not registered with the Japanese police; that her husband sold their three "tan" of land for a small sum of money after they moved to Tokyo; that for some years after hostilities ceased, conditions were quite unsettled in Japan during the military Occupation, and although people were urged to work neither plaintiff

nor her husband worked in their regular occupation as barbers; that jobs were difficult to obtain and plaintiff's husband was too old to obtain any available work; that during their stay in Japan, they merely existed and lived and did not establish a residence nor a domicile as required by the Trading with the Enemy Act to be classified as enemies;

12) That although plaintiff and her husband testified through interpreters, their oral testimony, as well as that of Aisuke Kuniyuki, is worthy of belief, and such testimony was corroborated by many exhibits introduced at the trial;

13) That the plaintiff was and is the owner of the three bonds and coupons which are the subject matter of this action;

### Conclusions of Law

1) That this Court has jurisdiction of this cause under Section 9(a) of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 9;

2) That plaintiff is and was continuously for 25 or more years before December 7, 1941 and continuously thereafter to the date of this action, filed on December 11, 1957, a permanent resident of the Territory of Hawaii, United States of America; plaintiff was not resident within Japan or territory (including that occupied by the military and naval forces) of any nation with which the United States was at war during the period December 7, 1941 to May, 1954; that plaintiff is not and was not an "enemy" nor an "ally of enemy" as those terms are defined in Section 2 of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 2, during said period December 7, 1941 to December 11, 1957 when this suit was filed;

3) That all of the three bonds and coupons described in paragraph III of the complaint filed in this cause were owned solely by the plaintiff before it was vested on or about January 24, 1951 by Vesting Order Number 17194 and thereafter seized by the then Attorney General of the United States in his ca-pacity as the Successor to the Alien Property Custodian;

4) Plaintiff is entitled to the immediate return from defendant of all said bonds together with any coupons thereto attached; that if said bonds and coupons have been sold or cashed, plaintiff is entitled to all proceeds therefrom;

5) That defendant is entitled to deduct before return conservatory expenses incurred in the custody and care of said bonds.

It is ordered, and counsel for plaintiff will submit appropriate judgment in accordance herewith.